## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CENTER FOR BIOLOGICAL
DIVERSITY and CENTER FOR
FOOD SAFETY,

                    *Plaintiffs*,

      v.                                   Civil Case No. 1:19-cv-02898-APM

DAVID BERNHARDT, MARGARET
EVERSON, U.S. FISH AND WILDLIFE
SERVICE, and U.S. DEPARTMENT OF
THE INTERIOR,

                    *Defendants*.

_____

### DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

STATUTORY AND REGULATORY BACKGROUND.............................................2

    I.     The Administrative Procedure Act ..........................................................2

    II.    The National Wildlife Refuge System Administration Act....................2

    III.   The National Environmental Policy Act..................................................3

    IV.   The Endangered Species Act ..................................................................4

    V.    The Fish and Wildlife Service's Manual ...............................................5

        A.    Refuge Management Guidelines in the Manual........................ 6

        B.    Integrated Pest Management Policy.......................................... 6

FACTUAL BACKGROUND....................................................................................7

    II.    The 2014 Memo .....................................................................................7

    II.    The 2018 Memo .....................................................................................8

    III.   Past Litigation ........................................................................................9

STANDARD OF REVIEW ....................................................................................10

ARGUMENT ........................................................................................................11

    I.     This Court Lacks Jurisdiction Over Plaintiffs' Claims..................................11

        A.    Plaintiffs Lack Standing........................................................ 11

            1.    Plaintiffs Have Not Suffered a "Concrete" and "Particularized" Injury to Their Interests in Refuge Land or Particular Species.......................................................... 13

            2.    Plaintiffs' Expenditure of Resources to Litigate This Case Does Not Establish Organizational Standing............................... 17

            3.    Plaintiffs' Alleged Informational and Procedural Injuries Do Not Create Standing Because Plaintiffs Have Failed to Identify a Concrete Interest.......................................... 19

        B.    Plaintiffs' Claims Are Not Ripe............................................ 21

i

<table>
<tr><td>1.</td><td>Plaintiffs' Claims Are Not Fit for Judicial Review ...................... 22</td></tr>
</table>

        2.      Withholding Review Will Not Cause Substantial Hardship
to the Parties................................................................................ 24

        3.      Plaintiffs' Procedural Claims Are Also Unripe ........................... 25

II.     Plaintiffs' Claims Fail Because They Do Not Allege a Final Agency Action.......27

    A.     Only Final Agency Actions Are Judicially Reviewable .......................... 28

    B.     The 2018 Memo Is Not a Final Agency Action........................................ 29

        1.      The 2018 Memo Does Not Consummate the Service's
Decisionmaking Process ................................................................ 29

        2.      The 2018 Memo Has No Legal Consequences............................. 31

CONCLUSION...............................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967)..................................................................................... 21, 24

*Action All. of Senior Citizens of Greater Phila. v. Heckler,*
   789 F.2d 931 (D.C. Cir. 1986).......................................................................... 22, 23

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).............................................................................................. 33

*Atl. States Legal Found. v. EPA,*
   325 F.3d 281 (D.C. Cir. 2003)............................................................................ 24, 25

*Baker v. Carr,*
   369 U.S. 186 (1962)................................................................................................ 9

*Bennett v. Spear,*
   520 U.S. 154 (1997).......................................................................................... 2, 28

*Cal. Cmtys. Against Toxics v. EPA*
   934 F.3d 627 (D.C. Cir. 2019)................................................................ 28, 29, 31, 32

*California v. EPA,*
   940 F.3d 1342 (D.C. Cir. 2019).............................................................................. 32

*Cigar Ass'n of Am. v. FDA,*
   323 F.R.D. 54 (D.D.C. 2017)................................................................................. 18

*Coal. for Mercury-Free Drugs v. Sebelius,*
   671 F.3d 1275 (D.C. Cir. 2012)............................................................................. 13

*Coal. for Underground Expansion v. Mineta,*
   333 F.3d 193 (D.C. Cir. 2003)............................................................................... 10

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
   563 F.3d 466 (D.C. Cir. 2009)................................................................... 16, 25, 26

*Ctr. For Food Safety v. Jewell,*
   83 F. Supp. 3d 126 (D.D.C. 2015)............................................................................ 9

*Ctr. for Food Safety v. Salazar,*
   898 F. Supp. 2d 130 (D.D.C. 2012).......................................................................... 9

*Ctr. for Food Safety v. Salazar,*
   900 F. Supp. 2d 1 (D.D.C. 2012)............................................................................. 9

*Ctr. for Law & Educ. v. Dep't of Educ.,*
   396 F.3d 1152 (D.C. Cir. 2005).............................................................................. 17

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006)......................................................................................... 10, 19

*Defs. of Wildlife v. Salazar,*
651 F.3d 112 (D.C. Cir. 2011) ............................................................................. 2, 27

*Del. Audubon Soc'y, Inc. v. Sec'y of U.S. Dep't of Interior,*
612 F. Supp. 2d 442 (D. Del. 2009) ............................................................................ 9

*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004) ...................................................................................................... 4

*Exxon Mobil Corp. v. FERC,*
501 F.3d 204 (D.C. Cir. 2007) .................................................................................. 10

*Fisheries Survival Fund v. Jewell,*
No. 16-CV-2409 (TSC), 2018 WL 4705795 (D.D.C. Sept. 30, 2018) .................... 26

*Fla. Audubon Soc'y v. Bentsen,*
94 F.3d 658 (D.C. Cir. 1996) .................................................................................... 19

*Food & Water Watch, Inc. v. Vilsack,*
808 F.3d 905 (D.C. Cir. 2015) .............................................................. 14, 15, 17, 18

*Friends of Animals v. Jewell,*
115 F. Supp. 3d 107 (D.D.C. 2015) .......................................................................... 19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
528 U.S. 167 (2000) .................................................................................................... 11

*Fund for Animals v. Williams,*
391 F. Supp. 2d 132 (D.D.C. 2005) .......................................................................... 31

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) .................................................................................................... 11

*Holistic Candlers & Consumers Ass'n v. FDA,*
664 F.3d 940 (D.C. Cir. 2012) .................................................................................. 30

*Hurd v. Dist. of Columbia,*
864 F.3d 671 (D.C. Cir. 2017) .................................................................................. 11

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.,*
402 F.3d 1249 (D.C. Cir. 2005) .......................................................................... 10, 12

*Kaempe v. Myers,*
367 F.3d 958 (D.C. Cir. 2004) ............................................................................ 11, 33

*Karst Envtl. Educ. & Prot., Inc. v. EPA,*
475 F.3d 1291 (D.C. Cir. 2007) ................................................................................ 27

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
376 F.3d 1123 (D.C. Cir. 2004) ................................................................................ 12

*La. Envtl. Action Network v. Browner,*
87 F.3d 1379 (D.C. Cir. 1996) .................................................................................. 21

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................ 10, 11, 13, 14, 15, 21

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ..................................................................... 22, 23, 24, 31

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ................................................................................... 4

*McGrail & Rowley, Inc. v. Babbitt,*
  986 F. Supp. 1386 (S.D. Fla. 1997) ................................................................ 31

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) .................................................................................. 11

*N.Y. Reg'l Interconnect, Inc. v. FERC,*
  634 F.3d 581 (D.C. Cir. 2011) ...................................................................... 19

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) .................................................................................. 27

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
  417 F.3d 1272 (D.C. Cir. 2005) ..................................................................... 10

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior,*
  538 U.S. 803 (2003) .................................................................................. 21

*Nat'l Taxpayers Union v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) ...................................................................... 17

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ..................................................................................... 2

*Ohio Forestry Ass'n v. Sierra Club,*
  523 U.S. 726 (1998) ............................................................................... 24, 25

*Papasan v. Allain,*
  478 U.S. 265 (1986) .................................................................................. 10

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
  489 F.3d 1279 (D.C. Cir. 2007) ............................................................... 14, 15, 21

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
  324 F.3d 726 (D.C. Cir. 2003) ...................................................................... 28

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ................................................................................. 3, 4

*Schlesinger v. Reservists Comm. To Stop the War,*
  418 U.S. 208 (1974) .................................................................................. 20

*Sierra Club v. Morton,*
  405 U.S. 727 (1972) .................................................................................. 18

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  64 F. Supp. 3d 128 (D.D.C. 2014) ........................................................ 4

*Smith v. United States*,
  237 F. Supp. 3d 8 (D.D.C. 2017) ........................................................ 18

*Soundboard Ass'n v. Fed. Trade Comm'n*,
  888 F.3d 1261 (D.C. Cir. 2018) .................................................... 28, 30

*Sprint Corp. v. FCC*,
  331 F.3d 952 (D.C. Cir. 2003) ............................................................ 23

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................ 10

*\*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .......................................................... 11, 13, 14, 20

*Sw. Airlines Co. v. U.S. Dep't of Transp.*,
  832 F.3d 270 (D.C. Cir. 2016) ............................................................ 28

*Swanson Group Mfg. LLC v. Jewell*,
  790 F.3d 235 (D.C. Cir. 2015) ............................................................ 19

*Texas v. United States*,
  523 U.S. 296 (1998) .......................................................................... 27

*Toilet Goods Ass'n v. Gardner*,
  387 U.S. 158 (1967) .......................................................................... 23

*Trudeau v. Fed. Trade Comm'n*,
  456 F.3d 178 (D.C. Cir. 2006) ............................................................ 10

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) .............................................................. 17

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) ...................................................................... 28

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
  454 U.S. 464 (1982) .......................................................................... 20

*W. Radio Servs. Co. v. Espy*,
  79 F.3d 896 (9th Cir. 1996) ................................................................ 31

*Warth v. Seldin*,
  422 U.S. 490 (1975) .......................................................................... 13

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ............................................................ 20

*Wyo. Outdoor Council v. Bosworth*,
  284 F. Supp. 2d 81 (D.D.C. 2003) ...................................................... 26

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
   165 F.3d 43 (D.C. Cir. 1999) ................................................................ 26

**Statutes**

16 U.S.C. § 1533 ..................................................................................... 4

16 U.S.C. § 1536(a)(2) ...................................................................... 5, 26

16 U.S.C. § 1540(g) ................................................................................ 27

16 U.S.C. § 668dd(a)(4)(B) ..................................................................... 5

16 U.S.C. § 668dd(d)(1)(A) .................................................................. 16

16 U.S.C. § 668dd(e) ............................................................................. 30

16 U.S.C. §§ 668dd–668ee ...................................................................... 2

42 U.S.C. § 4321 ...................................................................................... 3

42 U.S.C. § 4332(2)(C) ............................................................................ 4

5 U.S.C. § 702 .......................................................................................... 2

5 U.S.C. § 704 .................................................................................... 2, 27

5 U.S.C. § 706(1) ..................................................................................... 2

5 U.S.C. § 706(2)(A) ................................................................................ 2

**Regulations**

40 C.F.R. § 1500.3 ................................................................................... 4

40 C.F.R. § 1501.1 ................................................................................... 4

40 C.F.R. § 1502.5 ................................................................................... 4

50 C.F.R. § 17.11 ..................................................................................... 4

50 C.F.R. § 224.101 ................................................................................. 4

50 C.F.R. § 402.01(b) .............................................................................. 4

50 C.F.R. § 402.02 ............................................................................. 5, 26

50 C.F.R. § 402.03(a) .............................................................................. 5

50 C.F.R. § 402.14 ................................................................................... 5

50 C.F.R. §§ 402.13-402.14 ............................................................... 5, 26

66 Fed. Reg. 3810 .................................................................................... 6

**Other Authorities**

Service Manual Chapters, available at https://www.fws.gov/policy/manuals/ (last accessed
   December 5, 2019) .......................................................................... 5, 6, 7, 22

## INTRODUCTION

Plaintiffs challenge an internal memorandum issued by the former Acting Director of the Fish and Wildlife Service (the Service) in 2018, which withdraws a 2014 internal memorandum stating the Service's intent to phase out most uses of neonicotinoid pesticides and genetically modified organisms (GMOs) on the National Wildlife Refuge System (the System).  Plaintiffs allege violations of the Administrative Procedure Act (APA), the National Wildlife Refuge System Administration Act as amended by the National Wildlife Refuge System Improvement Act (Refuge Act), the National Environmental Policy Act (NEPA), and the Endangered Species Act (ESA).  However, the 2018 memorandum does not commit the Service to any future action, does not have any binding legal effect, and expressly calls for additional analysis and future compliance with all applicable laws on a case-by-case basis *before* neonicotinoids or GMOs may be approved for use on the refuges.  *See* Compl. Ex. B, ECF No. 1-3 (2018 Memo); Declaration of Cynthia Martinez ¶ 4–5 ("Martinez Decl."), attached as Exhibit 1.  Indeed, at the time of the Complaint and as of the date of this motion, the 2018 memorandum has not caused *any* change in the use of neonicotinoid pesticides or GMOs on refuge land.  Martinez Decl. ¶ 6.

As such, Plaintiffs' Complaint should be dismissed on three independent grounds: (1) Plaintiffs lack standing; (2) Plaintiffs fail to assert claims ripe for adjudication; and (3) Plaintiffs do not challenge a final agency action.  Plaintiffs fail to identify a concrete and articulable harm caused by the 2018 memo and do not challenge any ripe final agency action that is judicially reviewable.

## STATUTORY AND REGULATORY BACKGROUND

### I.      The Administrative Procedure Act

The APA identifies who may challenge agency action and what actions may be challenged.  Section 702 provides a cause of action for those suffering actual injury as a result of a final agency action.  5 U.S.C. § 702.  "Final agency action" forms the basis of a court challenge and provides the court the authority to review the case under the APA.  5 U.S.C. § 704 ("Agency action made reviewable by statute and *final agency action for which there is no other adequate remedy in a court* are subject to judicial review.") (emphasis added).  "Final agency action" is the consummation of the agency's decisionmaking process from which "legal consequences will flow" or "rights or obligations have been determined."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Under the APA, the court may "hold unlawful and set aside" final agency action that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The APA also provides for a court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004).

### II.     The National Wildlife Refuge System Administration Act

The System includes over 568 refuges and more than 855 million acres of protected land, divided into eight geographic regions.  Martinez Decl. ¶ 1.  *Defs. of Wildlife v. Salazar*, 651 F.3d 112, 113 (D.C. Cir. 2011).  The Department of the Interior delegates to the Service authority to manage these properties pursuant to the Refuge Act, codified at 16 U.S.C. §§ 668dd–668ee.  The mission of the System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future

generations of Americans." *Id*. § 668dd(a)(2).  Each particular refuge also has a purpose or

purposes.  *Id*. § 668dd(a)(3)(A).  In administering the System, the Service is to "ensure that the

biological integrity, diversity, and environmental health of the System are maintained."  *Id*. §

668dd(a)(4)(B).  The Service must also "ensure effective coordination, interaction, and

cooperation with owners of land adjoining refuges and fish and wildlife agency of the States in

which the units of the System are located."  *Id*. § 668dd(a)(4)(E).  Should a conflict arise

between a refuge's purpose and the System's mission, the Service must resolve conflicts "in a

manner that first protects the purposes of the refuge, and, to the extent practicable, that also

achieves the mission of the System."  *Id*. § 668dd(a)(4)(D).

The Service manages the System by issuing comprehensive conservation plans for each

refuge.  *Id*. § 668dd(e).  Those plans are updated every 15 years.  *Id.* § 668dd(e)(1)(A)(iv)

During the comprehensive conservation planning stage, the Service identifies the purposes of the

specific refuge and makes and revises determinations that a refuge use is compatible with those

purposes ("compatibility determination").  *Id* § 668dd(e).; *see also Id.* §§ 668dd(d)(1)(A), (B)

and (d)(3)(A)(i).  Except under limited circumstances, "the Secretary shall not initiate or permit a

new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary

has determined that the use is a compatible use and that the use is not inconsistent with public

safety."  *Id* § 668dd(d)(3)(A)(i).

### III.    The National Environmental Policy Act

NEPA, codified at 42 U.S.C. § 4321 *et seq*., establishes a "national policy [to] encourage

productive and enjoyable harmony between man and his environment," and was intended to

reduce or eliminate environmental damage and to promote "the understanding of the ecological

systems and natural resources important to" the United States.  42 U.S.C. § 4321.  "NEPA itself

does not mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Rather, NEPA imposes only procedural requirements on federal agencies to take a hard look at the environmental impact of their proposals and actions.  *See id*. at 349–350; *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–58 (2004).

NEPA requires federal agencies to consider the environmental effects of certain federal actions prior to making decisions, through an Environmental Assessment (EA) or, if necessary, an Environmental Impact Statement (EIS).  42 U.S.C. § 4332(2)(C); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); 40 C.F.R. § 1501.1.  The Council of Environmental Quality (CEQ), established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide federal agencies in determining what actions are subject to that statutory requirement.  *See* 40 C.F.R. § 1500.3.  The duty to consider environmental effects under NEPA is triggered only when an agency is actively considering undertaking a proposed major federal action.  40 C.F.R. § 1502.5 ("An agency shall commence preparation of an [environmental analysis under NEPA] as close as possible to the time the agency is developing or is presented with a proposal."); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 141 (D.D.C. 2014), *aff'd* 803 F.3d 31 (D.C. Cir. 2015).

## IV.    The Endangered Species Act

The ESA provides for the listing of species as threatened or endangered.  16 U.S.C. § 1533.  The Secretaries of the Interior and Commerce are responsible for enforcing the ESA, and they have delegated their respective responsibilities to the Service and the National Marine Fisheries Service (NMFS).  *See id.* § 1532(15).  In general, the Service has responsibility for terrestrial and freshwater species and NMFS has responsibility for marine species and anadromous fish.  *See* 50 C.F.R. § 402.01(b); *see also id.* §§ 17.11, 224.101.  The statute itself

provides the mechanism to allow species to be designated as threatened or endangered, and obtain the attendant protections.  16 U.S.C. § 1533.

Section 7 of the ESA directs federal agencies to ensure, in consultation with the Service or NMFS (the "consulting agency"), that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat.  16 U.S.C. § 1536(a)(2).  The term "action" is defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas."  50 C.F.R. § 402.02. Section 7 applies to "all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03(a).  If the agency proposing the relevant action ("action agency") determines that the action "may affect" listed species or critical habitat, Section 7 requires the action agency to pursue consultation with either the Service or NMFS, depending on the species.  50 C.F.R. §§ 402.13–402.14.  The purpose of consultation is to determine whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify the critical habitat of such species.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

## V.      The Fish and Wildlife Service's Manual

The Service has promulgated a Manual that sets forth internal policies and best practices for fulfilling its mission.  *See* Service Manual Chapters, *available at* https://www.fws.gov/policy/manuals/ (last accessed December 5, 2019).  The Manual provides guidance for how to interpret and implement the Service's statutory and regulatory obligations. Some of the Service's policies were subject to notice and comment before adoption, but not all.

### A.     Refuge Management Guidelines in the Manual

With respect to the Service's obligation under the Refuge Act to "ensure that the biological integrity, diversity, and environmental health of the System are maintained," the Service has issued a Biological, Diversity and Environmental Health (BIDEH) policy.  16 U.S.C. § 668dd(a)(4)(B); 601 FW 3.  The BIDEH policy was published in the Federal Register and subject to notice and comment.  66 Fed. Reg. 3810 (Jan. 16, 2001).

The BIDEH Policy provides that decisions related to managing the refuges will be based on "sound professional judgment."  601 FW 3.7(B) & (F).  The Service recognizes that these management decisions are "inherently complex" and that sound professional judgment should incorporate "field experience, knowledge of refuge resources, refuge role within an ecosystem, applicable laws, and best available science."  *Id*. at 3.7(F).  Part 601 FW 3.15(C) provides that the Service does not "use genetically modified organisms in refuge management unless we determine their use is essential to accomplishing refuge purpose(s) and the Regional Chief, National Wildlife Refuge System, approves the use."  Part 602 of the Manual provides further guidance for refuge planning, including guidelines for creating comprehensive conservation plans, step-down management planning, and approving compatibility determinations.  *See generally* 602 FW 1–4.  The Manual recognizes that comprehensive conservation plans must comply with NEPA.  602 FW 1.4.  The Manual also recognizes that Service actions approving refuge uses must comply with NEPA and a compatibility determination.  603 FW 2.18.

### B.     Integrated Pest Management Policy

The Service's Integrated Pest Management (IPM) Policy, set forth in 569 FW 1, provides long-standing integrated pest management principles to guide and evaluate pesticide use practices.  The Service defines pests as living organisms, including invasive plants, that interfere

6

with the Service's management goals or that jeopardize human health or safety.  569 FW 1.3.

The Service's IPM Policy embodies a "sustainable approach to managing pests" that minimizes

health, environmental, and economic risks using a variety of pest management tools.  569 FW

1.12.  Pesticides are but one tool in the Service's pest management toolbox.  Other tools include

biological tools (predators, parasites, and pathogens); cultural tools (crop rotation); and physical

tools (traps, hand-pulling, hoeing, mowing, tilling).  The IPM Policy favors selecting the lowest

risk and most effective IPM method that is feasible for a project.  569 FW 1.4(F).  The IPM

Policy also requires that the Service complete procedural prerequisites before conducting pest

management activities, including preparing Pesticide Use Proposals (PUPs), updating the PUPs

database, and complying with the ESA and NEPA.)  *Id*. 1.4(H).

## FACTUAL BACKGROUND

### I.      The 2014 Memo

In 2014, James Kurth, then Chief of the National Wildlife Refuge System, issued an

internal memorandum to the Regional Refuge Chiefs for Regions 1–8, entitled "Use of

Agricultural Practices in Wildlife Management in the National Wildlife Refuge System."

Compl. Ex. A, ECF No. 1-2 (2014 Memo).  The 2014 Memo "records the decision of the  . . .

Leadership Team . . . regarding the use of agricultural practices for wildlife management on . . .

refuges."  *Id*.  The Leadership Team "agreed that by January 2016, the System will only use an

agricultural practice where it specifically contributes to wildlife objectives" in an effort to

conform to the BIDEH Policy.  *Id*.  To effectuate this decision, the 2014 Memo stated that

refuges would no longer use genetically-engineered crop seeds or neonicotinoid pesticides in

agriculture.  The Service stated in its memorandum that this change was "based on a

precautionary approach to our wildlife management practices and not on agricultural practices."

*Id*.  With respect to neonicotinoids, the Service noted that "[t]here can be appropriate and

specialized uses . . . subject to review through all applicable laws, regulations, and policies

including, but not limited to, the National Environmental Policy Act." *Id*.  With respect to

GMOs, the Service made a blanket determination that GMOs were not "essential to

accomplishing refuge purpose(s)," *id.* (citing 601 FW 3.15(C)), and affirmed its intent to phase

out feeding such crops to wildlife, but left open consideration of "whether the temporary use of

genetically modified crops in habitat restoration is essential on a case-by-case basis." *Id*.  The

2014 Memo expressly excluded from its purview those refuges with agricultural purposes such

as Tule Lake, Upper and Lower Klamath, and Crab Orchard.  *Id*.

## II.     The 2018 Memo

In 2018, Gregory Sheehan, then Principal Deputy Director of the Service, issued an

internal memorandum to the Service Directorate withdrawing the 2014 Memo and "reversing the

decision to universally ban the use of genetically modified crops on the refuges."  2018 Memo.

The 2018 Memo also withdraws the 2014 Memo's restrictions regarding neonicotinoid

pesticides.  *Id*.  While the 2018 Memo acknowledges that "[i]n some cases the phasing out of

[GMOs and neonicotinoids] was appropriate and expedient," the Service explains that the

importance of farming for providing for the energetic needs of waterfowl and migratory birds

and preserving flexibility for professional refuge managers.  *Id*.  The 2018 Memo thus notes that

"[t]here may be situations . . .  where use of GMO crop seeds is essential to best fulfill the

purposes of the refuge and the needs of birds and other wildlife as described above.  A blanket

denial of GMOs does not provide on-the-ground latitude for refuge managers to work adaptively

and make field level decisions about the best manner to fulfill the purposes of the refuge."  *Id*.

With the withdrawal of the 2014 Memo, the Service is "now to determine the

appropriateness of the use of those crops on a case-by-case basis, in compliance with all relevant

and controlling legal authorities (including NEPA) and Service policies." *Id*. The Service may

also consider the use of neonicotinoids on a case-by-case basis in compliance with proper

authorities. *Id*. The 2018 Memo notes that GMO use may not resume in Region 5 until any

requisite NEPA review is complete and the use complies with a 2011 settlement agreement that

resolved earlier litigation, referenced as *Delaware Audubon Society v. Salazar* (D. Del.). *Id*.

The 2018 Memo does not authorize the use of neonicotinoid pesticides or GMOs on any

particular refuge.

### III.    Past Litigation

Past litigation involving the use of pesticides or GMOs on the refuges has challenged

specific agency actions like comprehensive conservation plans or compatibility determinations.

In *Delaware Audubon Society, Inc. v. Secretary of U.S. Department of Interior*, 612 F. Supp. 2d

442, 451 (D. Del. 2009), plaintiffs successfully challenged the Service's approval of cooperative

agricultural agreements that permitted cooperative farmers to use GMOs on the Prime Hook

National Wildlife Refuge.  In another case, plaintiffs unsuccessfully challenged a programmatic

EA and compatibility determinations approving farming with GMOs in former Region 3 of the

System.  *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 151 (D.D.C. 2012).  In *Center for

Food Safety v. Salazar*, 900 F. Supp. 2d 1, 3 (D.D.C. 2012), plaintiffs challenged the Service's

approval of farming using GMOs in former Region 4 of the System.  In *Center For Food Safety

v. Jewell*, 83 F. Supp. 3d 126, 131 (D.D.C. 2015), plaintiffs challenged, *inter alia*, the Service's

failure to revise a comprehensive conservation plan to address the use of GMOs and

neonicotinoids.  Recently, in *Center for Biological Diversity v. Zinke*, Case No. 1:17-cv-468 (D.

Or.), plaintiffs unsuccessfully challenged a comprehensive conservation plan issued in

connection with five Klamath National Wildlife Refuges that did not ban outright pesticides.

Nov. 19, 2019 Order, attached as Exhibit 2.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of claims where the court lacks jurisdiction. *Baker v. Carr*, 369 U.S. 186, 198 (1962). Jurisdiction is a threshold issue that a court must determine first. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause."). No subject matter jurisdiction exists without establishing standing and ripeness. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1286 (D.C. Cir. 2005); *Exxon Mobil Corp. v. FERC*, 501 F.3d 204, 207 (D.C. Cir. 2007). Plaintiffs bear the burden of establishing each element of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Generally, the Court must accept the factual allegations in the complaint as true, but may also consider materials outside of the pleadings. *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (the court may resolve "disputed facts" when ruling on a motion under Rule 12(b)(1)).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of claims where Plaintiffs have failed to state a claim upon which relief can be granted. While the Court must treat every factual allegation as true, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Additionally, the Court need not "accept as true the complaint's

10

factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

## ARGUMENT

### I.     **This Court Lacks Jurisdiction Over Plaintiffs' Claims**.

The Court lacks jurisdiction over Plaintiffs' claims because Plaintiffs have not alleged any concrete harm resulting from the 2018 Memo's withdrawal of a previous blanket interpretation of Service policies.  Plaintiffs' claims are also unripe because any harm they might suffer in the future—due to the use of GMOs or neonicotinoid pesticides on refuges—would only occur as a result of future agency actions that, at this point, are purely conjectural and speculative.

### A.     **Plaintiffs Lack Standing.**

Article III standing is an "irreducible constitutional minimum" for federal court jurisdiction. *Lujan*, 504 U.S. at 560.  "Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *accord Summers v. Earth Island Inst.*, 555 U.S. 488 (2009); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 180-81 (2000); *Lujan*, 504 U.S. at 561. To meet the Constitution's standing requirements to sue as associations on behalf of their members, the plaintiff-associations in this case must demonstrate that one or more of their members would have standing to sue in their own right.  *See Friends of the Earth*, 528 U.S. at 181.  Plaintiff-associations may also attempt to demonstrate that the organizations themselves have been harmed.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).

Plaintiffs have not alleged that they or their members have suffered a concrete, particularized, and actual or imminent injury that is either traceable to the 2018 Memo or

redressable though this suit.  The 2018 Memo did not approve the use of GMOs or

neonicotinoids on any refuge or make any final determination regarding whether such use would

comply with existing laws, regulations, or Service policies.  2018 Memo; Martinez Decl. ¶ 5.[1]

Instead, the memo merely removed what had previously been a blanket determination and

explained that from then on, the Service will "determine the appropriateness of the use of those

crops on a case-by-case basis, in compliance with all relevant and controlling legal authorities

(including NEPA) and Service policies."  2018 Memo.  Plaintiffs do not allege that the 2018

Memo has led to any GMOs or neonicotinoids actually being used on refuges in a manner that

would have been barred by the 2014 Memo.  Nor could they.  At the time that Plaintiffs filed

their Complaint (and as of the date of this motion), *no* GMOs or neonicotinoids had been used on

refuge land for agricultural purposes.  *See* Martinez Decl. ¶¶ 6–7.  In other words, the 2018

Memo allows the agency to make a case-by-case determination regarding the appropriateness of

using GMOs or neonicotinoids, but no case-by-case determination approving such actions has

been made since the memo's issuance.  It has not led to the utilization of GMOs or

neonicotinoids on refuge land, has not resulted in any physical effect to the environment or

wildlife, and has had no effect on Plaintiffs, their members, or any other individual.

---

[1] A motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) or 12(b)(6) may rely upon "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  *Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quotations omitted).  The 2018 and 2014 Memos were both attached to Plaintiff's Complaint and therefore can be considered in regard to all of Defendants' arguments without converting this motion into one for summary judgment.  *See* 2014 Memo and 2018 Memo.  Additionally, when ruling on a motion pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court may consider materials outside of the pleadings to determine whether, as a factual matter, the Court lacks jurisdiction.  *See Jerome Stevens Pharm.*, 402 F.3d at 1253; *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004).  Thus, Defendants' jurisdictional arguments can properly rely upon outside information, such as the Martinez Declaration.

Plaintiffs allege three primary categories of injuries: (1) injuries to their members due to harm to the environment, listed species, or their members' health; (2) injuries to the plaintiff-organizations themselves; and (3) procedural or informational injuries to Plaintiffs and their members.  Taking the allegations in Plaintiffs' Complaint as true, they have failed to meet their burden of alleging a concrete, particularized injury that is actual or imminent and traceable to the 2018 Memo.  *See Lujan*, 504 U.S. at 560-61; *Summers*, 555 U.S. at 493 (a plaintiff "bears the burden of showing that he has standing for each type of relief sought").

1.    *Plaintiffs Have Not Suffered a "Concrete" and "Particularized" Injury to Their Interests in Refuge Land or Particular Species.*

First, Plaintiffs fail to allege facts supporting the proposition that their members have standing to challenge the 2018 Memo due to the alleged environmental or health effects of the hypothetical future use of GMOs or neonicotinoid pesticides on refuges.  Plaintiffs allege that they have members who utilize refuge land throughout the country and have interests in various unnamed species.  Compl. ¶ 24.  Plaintiffs also make a conclusory allegation that using neonicotinoid pesticides and GMOs on refuges "adversely impacts wildlife and their habitats" and could cause health effects to Plaintiffs' members.  Compl. ¶¶ 25–26.  Plaintiffs' claim that the 2018 Memo could someday, in some unknown location and manner, affect these broad interests or cause unexplained harms does not constitute a cognizable injury under Article III.

The injury-in-fact element of standing requires a showing that an organization or at least one of its members has suffered or will suffer an actual or imminent, concrete and particularized injury-in-fact.  *See Lujan*, 504 U.S. at 560–61.  This is so because the "judicial Power" conferred by Article III "'exists only to redress or otherwise to protect against injury to the complaining party,' not to review the legality of governmental conduct in a vacuum."  *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1279 (D.C. Cir. 2012) (quoting *Warth v. Seldin*, 422 U.S. 490,

13

499 (1975)).  A plaintiff must have a "personal stake in the outcome of the controversy" that

would "justify exercise of the court's remedial power on his behalf."  *Warth*, 422 U.S. at 498-99

(citation omitted).  Where, as here, Plaintiffs are not themselves the "object of the government

action or inaction [they] challenge[], standing is not precluded, but it is ordinarily substantially

more difficult to establish." *Lujan*, 504 U.S. at 562 (quotation omitted).

Rather than identifying any actual or imminent concrete and particularized injury-in-fact,

the alleged injuries described in Plaintiffs' Complaint are entirely speculative.  "A concrete

injury is 'direct, real, and palpable—not abstract.'" *Food & Water Watch, Inc. v. Vilsack*, 808

F.3d 905, 914 (D.C. Cir. 2015) (quoting *Public Citizen, Inc. v. Nat'l Highway Traffic Safety

Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007)).  "A particularized injury is 'personal, individual,

distinct, and differentiated—not generalized or undifferentiated.'"  *Id.* (quoting *Public Citizen*,

489 F.3d at 1289)).  Plaintiffs do not allege any "direct, real, and palpable" injury resulting from

the 2018 memo.  As explained in *Summers v. Earth Island Institute*, Plaintiffs cannot challenge a

regulation (which, unlike the 2018 Memo, actually is a final agency action with binding effect)

"in the absence of a live dispute over a concrete application of those regulations."  555 U.S. at

490.  In that case, the plaintiffs' general interest in utilizing National Forest land was not

sufficient to challenge a rule altering certain processes for future Forest Service actions.  *Id.* at

494–95.  The Supreme Court held that the plaintiffs had failed "to allege that *any* particular

timber sale or other project claimed to be unlawfully subject to the regulations will impede a

specific and concrete plan of [the member of the plaintiff-organization] to enjoy the national

forests." *Id.* at 495.  Similarly, here, Plaintiffs' members may have a general interest in

recreating on some refuges, but have not identified any particular application of GMOs or

pesticides that will affect those interests.  Instead, they claim that the 2018 memo could increase

the chances that someday, somewhere, the Service will allow the use of GMOs or neonicotinoid pesticides for agricultural purposes on a refuge.  *See Lujan*, 504 U.S. at 564.  This "abstract" injury, which may never occur at all or may occur in a way that does not harm any of Plaintiffs' interests, does not suffice to establish standing.  Nor do Plaintiffs' vague and conclusory allegations identify a "personal, individual, distinct, and differentiated" injury to any of their members.  *Food & Water Watch*, 808 F.3d at 914.

Plaintiffs also fail to allege any facts indicating that the purported harm flowing from the 2018 Memo is "imminent."  While Plaintiffs allege that "[t]he past, present, and future enjoyment and use of these places by Plaintiffs and their members has been, is being, and will continue to be irreparably harmed" by the 2018 Memo, they provide no allegation of "past, present, [or] future" GMO or neonicotinoid pesticide use to support this conclusory statement.  Compl. ¶ 25.  An actual or imminent injury is "certainly impending and immediate—not remote, speculative, conjectural, or hypothetical."  *Public Citizen*, 489 F.3d at 1293.  "Were all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury."  *Id.* at 1294.  Plaintiffs' Complaint does not allege that any refuge has approved the use of GMOs or neonicotinoids for agricultural purposes following the 2018 Memo or has plans to do so imminently.  In the thirteen months between the issuance of the 2018 Memo and the filing of Plaintiffs' lawsuit, no such actions were approved (*see* Martinez Decl. ¶¶ 6–7), and the Complaint provides no factual allegations suggesting that the application of GMOs or neonicotinoids will occur imminently, let alone in a particular location and manner which could concretely harm one of their members' recreational, aesthetic, or other interests.

Plaintiffs likewise fail to adequately allege that their purported injuries are traceable to the 2018 Memo.  Any use of GMOs (or neonicotinoids) on refuges for agricultural purposes will be the result of a separate, future agency action or combination of agency actions.  For example, one way that such use could occur, and potentially affect Plaintiffs, is if: (1) a farmer applies for a cooperative agricultural agreement on a refuge and requests the use of GMOs and/or neonicotinoid pesticides; (2) the refuge determines that farming would be a compatible use of the refuge, 16 U.S.C. § 668dd(d)(1)(A), (B) and (d)(3); (3) the refuge determines that the use of GMOs is "essential to accomplishing refuge purpose(s)," 601 FW 3.15(C); (4) the Regional Chief approves the use of GMOs; (5) the Service considers any proposed use of neonicotinoid pesticides through the Pesticide Use Proposal System; (6) the Service complies with NEPA, the ESA, and any other requirements of the Refuge Act or Service policies; (7) the Service approves a commercial special use permit and enters into the cooperative agricultural agreement in accordance with all applicable laws and policies, including Manual Chapters 603 FW 1 (Appropriate Use), 603 FW 2 (Compatibility), and 620 FW 2 (Cooperative Agricultural Use); (8) the farmer actually plants GMOs; and (9) the farming practices results in actual, concrete harm to one of Plaintiffs' unidentified members who utilizes that specific area of the refuge.[2]  *See* Martinez Decl. ¶¶ 8-12.  "Such a causal chain cannot adequately establish causation because [Plaintiffs] rely on the speculation that various different groups of actors not present in this case"—namely farmers, the refuges, and various officials within the Service—"might act in a certain way in the future."  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009).  Even if this attenuated chain of events were to occur, any injury resulting

---

[2] Notably, the 2018 Memo does not mandate the outcome of any of the above determinations, or even encourage a particular outcome.  It merely provides flexibility to refuge managers to make these future, independent judgments depending on the needs of the refuge.

to Plaintiffs would be caused by the actual decision to authorize the use of GMOs or neonicotinoids pesticides, not the 2018 Memo's non-binding statements.

Plaintiffs fail to allege facts supporting their conclusory claim that their members will be harmed from the 2018 Memo in a manner that meets the Article III requirements: they allege no concrete, particularized injury-in-fact, no facts suggesting such harm is imminent, and no plausible traceability to the 2018 Memo.

2.      *Plaintiffs' Expenditure of Resources to Litigate This Case Does Not Establish Organizational Standing.*

Plaintiffs also fail to establish any injury-in-fact to the plaintiff-organizations themselves. Plaintiffs allege that, as organizations, the Center for Biological Diversity and the Center for Food Safety have had to divert organizational resources due to the 2018 Memo.  Compl. ¶¶ 16, 22, 23.  Both organizations assert that they have had to use resources to monitor and inform the public, including their members, about the 2018 Memo's impacts.  *Id.*  The only concrete example they provide is that both organizations have opted to pursue Freedom of Information Act (FOIA) requests regarding the 2018 Memo and may choose to do so again in the future. Compl. ¶¶ 16, 22.  Plaintiffs do not explain the purpose of these FOIA requests, other than to "increase transparency."  Compl. ¶¶ 16, 22.

D.C. Circuit "precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury."  *Food & Water Watch*, 808 F.3d at 919.  Plaintiffs' alleged organizational harms all appear to be related to expending resources on advocacy and investigating in preparation for this very lawsuit, through the FOIA requests.  *See Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) ("[T]he expenditure of resources on advocacy is not a cognizable Article III injury."); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 n.4

(D.C. Cir. 2005) ("[T]o hold that a lobbyist/advocacy group had standing to challenge government policy with no injury other than injury to its advocacy would eviscerate [the] standing doctrine's actual injury requirement.").  "[A]n organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended,'" which Plaintiffs have not alleged here.  *Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995); *see also Cigar Ass'n of Am. v. FDA*, 323 F.R.D. 54, 62-63 (D.D.C. 2017) (Mehta, J.) (assertion that proposed intervenors would "expend some undefined amount of additional resources" did not suffice to establish standing).  Plaintiffs have not alleged that the 2018 Memo actually affected their organizations directly or made it more difficult for the organizations to gather information or advocate for their causes.  *See Smith v. United States*, 237 F. Supp. 3d 8, 12 (D.D.C. 2017) (plaintiff's FOIA costs did not establish standing because challenged decision had not restricted his ability to gather information or made FOIA requests more costly, so the relief requested would not redress plaintiff's alleged harm), *aff'd,* 715 F. App'x 10 (D.C. Cir. 2018).  The only reason Plaintiffs have diverted resources to obtain information about the 2018 Memo is that they oppose it as a matter of policy; this is not a cognizable injury to establish Article III standing.  *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) ("[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA.").

3.      *Plaintiffs' Alleged Informational and Procedural Injuries Do Not Create Standing Because Plaintiffs Have Failed to Identify a Concrete Interest.*

To the extent Plaintiffs allege that the challenged agency action results in a procedural injury, the mere violation of a procedural requirement does not permit any and all persons to sue to enforce the requirement.[3]  *See* Compl. ¶¶ 28–29.  "Even 'a procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest.'"  *N.Y. Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 587 (D.C. Cir. 2011) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664–65 (D.C. Cir. 1996)).  While courts may loosen the requirement to show causation and redressability linking the missing procedural step to a change in the substantive outcome, "the Court has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest."  *Fla. Audubon Soc'y*, 94 F.3d at 664.

Thus, it is not enough for Plaintiffs to allege that their members' interests are harmed because they did not (or would not) have the opportunity to review a NEPA document or submit public comments on the 2018 Memo.  Instead, Plaintiffs must allege some concrete interest that is actually affected by the government action—*i.e.* some way that the 2018 Memo has actually caused a concrete harm to them, which may have been avoided if the Service had undertaken the

---

[3] Plaintiffs must establish standing for each claim for relief asserted in their Complaint.  *See DaimlerChrysler*, 547 U.S. at 352.  Several of Plaintiffs' claims are substantive challenges to the 2018 Memo and do not turn on any alleged procedural injury.  *See* Compl. ¶¶ 149-162 (Count I, alleging that the 2018 Memo violated the APA because it was contrary to the requirements and policy goals of the Refuge Act), ¶¶ 163–170 (Count II, alleging that the 2018 Memo violated the APA because it consisted of arbitrary and capricious decision making). Therefore, even if the Court finds sufficient allegations of procedural injury, only Counts III and IV could proceed.

procedures Plaintiffs advocate for.  *Id.*; *see also Summers*, 555 U.S. at 496-97; *Swanson Group Mfg. LLC v. Jewell,* 790 F.3d 235, 244-46 (D.C. Cir. 2015) (finding plaintiffs lacked standing to pursue their procedural claim where they did not connect the challenged methodology to a particular application that would injure them); *Friends of Animals v. Jewell,* 115 F. Supp. 3d 107, 114 (D.D.C. 2015) (Plaintiff "has not explained how the Department's deprivation of information has caused it any concrete harm.").  As explained above, the 2018 Memo has not concretely harmed Plaintiffs in any way, nor have they alleged such harm is imminent.  Any future harm to Plaintiffs would be caused, if at all, by subsequent agency actions, not by the general statements made in the 2018 Memo.  *See* Martinez Decl. ¶ 8–12.  These subsequent agency actions will need to comply with any applicable procedural requirements in NEPA and other laws (or risk judicial challenge).  Plaintiffs here have failed to demonstrate any impairment to a concrete interest as a result of the alleged violation of their informational or procedural rights.  *Cf. WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) ("The procedural injury the Appellants claim . . . is tied to their respective members' concrete aesthetic and recreational interests.").

In sum, Plaintiffs have failed to meet their burden of alleging a concrete, actual and imminent harm to their members' environmental and recreational interests, to organizational resources, or to procedural or informational deficiencies.  The constitutional and prudential standing requirements assure that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982).  Without any actual, imminent injury to Plaintiffs or their members, this lawsuit boils down to an attempt to

20

litigate general policy approaches regarding the appropriateness of using GMOs and neonicotinoid pesticides on refuges, a purely generalized grievance. *See Lujan*, 504 U.S. at 560, 575 (generalized grievance[s] are not akin to the invasion of a "legally protected" interest that is concrete and imminent); *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 220 (1974). Questions of this nature are best left to the legislative branch and the agency charged by Congress with making such management determinations. *See Public Citizen*, 489 F.3d at 1294 ("The Supreme Court has repeatedly held that disputes about future events where the possibility of harm to any given individual is remote and speculative are properly left to the policymaking Branches, not the Article III courts."). Plaintiffs lack standing, and the Court should dismiss this case.

### B.      Plaintiffs' Claims Are Not Ripe.

The doctrines of standing and ripeness overlap in cases like this, where the challenged action has not led to any concrete injury to Plaintiffs, and any harm that may accrue in the future will be the result of subsequent actions which have not yet occurred. *See La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1384 (D.C. Cir. 1996) ("That ripeness considerations should influence our standing analysis, however, is neither surprising nor troublesome."). Thus, for many of the same reasons given above, and because the 2018 Memo has not yet been implemented in a way that affects the Plaintiffs under either Article III or the prudential ripeness doctrines, Plaintiffs' claims challenging the 2018 Memo should be dismissed as unripe.

The purpose of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) (Unless a particular statutory provision "explicitly provides for [judicial] correction of the administrative process at a higher level of generality, [courts] intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action has an actual or immediately threatened effect.'") (citation omitted).  Courts determine whether an administrative action is ripe for judicial review by evaluating "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003).

### 1.   *Plaintiffs' Claims Are Not Fit for Judicial Review.*

The 2018 Memo merely explains that the Service will determine through subsequent, site-specific decisions whether to approve the use of neonicotinoids or GMOs on refuges—it has no current, concrete effect.  That is, the 2018 Memo does not determine whether GMOs are "essential to accomplishing refuge purpose(s)" in specific applications, )601 FW 3.15(C), or whether the use of GMOs or neonicotinoids on any refuges is consistent with other Service policies, regulations, or applicable laws.  *See* 2018 Memo; Martinez Decl. ¶ 5.  Accordingly, Plaintiffs' lawsuit prematurely challenges the 2018 Memo before any GMOs or neonicotinoids are actually approved for agricultural purposes, and thus before there is the type of concrete application that would be required to render claims ripe.

Under the fitness prong of the ripeness test, courts consider "whether the agency action is final; whether the issue presented for decision is one of law which requires no additional factual development; and whether further administrative action is needed to clarify the agency's position." *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 940 (D.C.

Cir. 1986).  The existence of "final agency action" is "'a crucial prerequisit[e]' to ripeness."
*Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003) (citation omitted).  As explained more
thoroughly below, the 2018 Memo is not a final agency action.  *See infra* Argument, Part II.

      Moreover, even where there is final agency action and the challenge raises issues of law,
the promulgation of a general policy "is not ordinarily considered the type of agency action
'ripe' for judicial review under the APA until the scope of the controversy has been reduced to
more manageable proportions, and its factual components fleshed out, by some concrete action
applying the regulation to the claimant's situation in a fashion that harms or threatens to harm
him." *Lujan*, 497 U.S. at 891.  Here, no concrete action has relied upon the 2018 Memo's lift of
the blanket moratorium on GMOs and neonicotinoid pesticides.  Instead, this is a situation
"where the agency retains considerable discretion to apply the new rule on a case-by-case basis,"
which the D.C. Circuit recognizes often makes a case unfit for review.  *Sprint Corp.*, 331 F.3d at
956.  In cases like this one, judicial review "is likely to stand on a much surer footing in the
context of a specific application" of the agency's policy than it would "in the framework of [a]
generalized challenge," like the one Plaintiffs present.  *Toilet Goods Ass'n v. Gardner*, 387 U.S.
158, 164 (1967).

      This is also a case where "additional factual development" would aid the Court's review.
*Action All. of Senior Citizens of Greater Phila.*, 789 F.2d at 940.  As described above, the 2018
Memo does not and cannot possibly affect Plaintiffs, unless and until future site-specific
determinations are made.  It would be helpful for the Court to know if any site-specific GMO or
neonicotinoid pesticide determinations are ever approved, and if so, the process used by the
agency, the rationale for its decision, and how such determination relates (if at all) to the 2018
Memo's general statements.  Plaintiffs assert a variety of abstract complaints without any

specific details regarding how possible Service approval of GMOs or neonicotinoids will affect refuges in the future, requiring the Court to "predict[] consequences that may affect many different parcels of land in a variety of ways, and which effects themselves may change over time." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 736 (1998). Review of these claims "threatens the kind of 'abstract disagreement over administrative policies' that the ripeness doctrine seeks to avoid." *Id.* (quoting *Abbott Labs.*, 387 U.S. at 148) (internal citations omitted). Courts should not step in to assess internal policies at such a "high[] level of generality," *Lujan*, 497 U.S. at 894, until "the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out," *id.* at 891.

In sum, Plaintiffs' claims are not fit for judicial consideration. The Court would benefit from further factual development of the issues presented in this case, rather than the abstract and hypothetical policy disputes presented by Plaintiffs.

        2.       *Withholding Review Will Not Cause Substantial Hardship to the Parties.*

As noted above, Plaintiffs' Complaint does not identify any current or imminent harm— whether direct or indirect—that Plaintiffs have suffered or will suffer due to the 2018 Memo. *See supra* Argument, Part I(A)(1). Nor would it be possible for Plaintiffs to demonstrate such harm, when the 2018 Memo has no impact whatsoever on private parties and makes no final determinations regarding the use of GMOs or neonicotinoid pesticides on refuges. *See* 2018 Memo. Like the government actions considered in *Ohio Forestry*, the 2018 Memo "do[es] not command anyone to do anything or to refrain from doing anything; [it does] not grant, withhold, or modify any formal legal license, power, or authority; [it does] not subject anyone to any civil or criminal liability; [it] create[s] no legal rights or obligations." *Ohio Forestry*, 523 U.S. at 733. Additionally, the 2018 Memo has not led to any decision causing a "current, direct effect on the

health or welfare of [Plaintiffs'] members." *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 285

(D.C. Cir. 2003).  Withholding court consideration of Plaintiffs' claims until the GMOs or

neonicotinoids are actually approved for use on refuge land would not cause Plaintiffs any

significant hardship.

Moreover, withholding the court's consideration at this time would not prevent Plaintiffs

from challenging the validity of the 2018 Memo at some point in the future, when appropriate.

*Atl. States Legal Found.*, 325 F.3d at 285 (Plaintiffs "may protect all of their rights and claims by

returning to court when the controversy ripens.").  Indeed, if the challenged general policy is

implemented in a future agency action in a way that actually harms Plaintiffs or their members,

Plaintiffs could bring a lawsuit challenging the agency action and may be able to challenge the

rationale of the 2018 Memo, if the Memo "plays a causal role with respect to the future, then-

imminent, harm."  *Ohio Forestry*, 523 U.S. at 734; *see supra* Factual Background, Part III

(describing past litigation on agency actions authorizing GMO use).  Thus, Plaintiffs "will have

ample opportunity later to bring [their] legal challenge at a time when harm is more imminent

and more certain."  *Id.*

### 3.      *Plaintiffs' Procedural Claims Are Also Unripe.*

As a general matter, claims of procedural injury are often ripe at the time of the allegedly

missed procedural step.  *See Ohio Forestry,* 523 U.S. at 737.  However, even Plaintiffs'

seemingly procedural claims (Counts III and IV) are not ripe for adjudication as the Service's

time to comply with its procedural obligations has not yet arisen.

As explained more thoroughly below, the 2018 Memo is neither a final agency action,

nor a major federal action that triggers the Service's obligation to comply with NEPA.  *See infra*

Argument, Part II.  The Service does not dispute that some hypothetical, future site-specific

decisions evaluating (and potentially approving) the use of GMOs or neonicotinoids may trigger procedural obligations under NEPA; indeed, the 2018 Memo contemplates as much. However, Plaintiffs' claims that the Service has failed to conduct a NEPA analysis are not now ripe, for the simple reason that the Service's obligation to complete any NEPA analysis has not, to date, arisen. The Service has not approved any new use of GMOs or neonicotinoids and has made no "irreversible and irretrievable commitment of resources." *See Ctr. for Biological Diversity*, 563 F.3d at 480–81 (Petitioners' NEPA challenges not ripe for review until the agency action reaches a "'critical stage' where an 'irreversible and irretrievable commitment of resources' has occurred that will adversely affect the environment."); *see also Wyo. Outdoor Council v. U.S. Forest Serv.,* 165 F.3d 43, 49–50 (D.C. Cir. 1999); *Fisheries Survival Fund v. Jewell*, No. 16-CV-2409 (TSC), 2018 WL 4705795, at *7 (D.D.C. Sept. 30, 2018).

Plaintiffs' ESA claim alleging procedural injury is likewise unripe. *See* Compl. ¶¶ 183-89. No duty to consult under Section 7 has yet arisen because the Service has not taken any agency action that may affect species listed as threatened or endangered under the ESA. 16 U.S.C. § 1536(a)(2). An agency action under the ESA is defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part" including "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid." 50 C.F.R. § 402.02. The 2018 Memo does not "authorize[], fund[], or carr[y] out" the use of GMOs or neonicotinoids on refuges. Additionally, the Section 7(a)(2) duty to consult only attaches when an action "may affect" listed species. 50 C.F.R. §§ 402.13-402.14. The internal 2018 Memo has no physical effect on the environment or any listed species. Therefore, the ESA failure to consult claim is not ripe. *See Ctr. for Biological Diversity*, 563 F.3d at 483 ("[T]he completion of the first stage of a leasing program does not cause any harm to anything because it does not

require any action or infringe on the welfare of animals. The welfare of animals is, by design, only implicated at later stages of the program, each of which requires ESA consultation and additional environmental review by Interior."); *see also Wyo. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 92-93 (D.D.C. 2003) (concluding that an ESA failure to initiate consultation claim was not ripe where development would occur only through future agency decisions, following the same logic of *Wyoming Outdoor Council*, 165 F.3d at 49-50).

In conclusion, Plaintiffs' substantive and procedural claims are not fit for judicial review, and withholding court consideration would not impose any cognizable hardships on the parties. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" like the hypothetical future approvals of GMOs or neonicotinoids in this case  *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).  Therefore, the Court lacks jurisdiction and should dismiss Plaintiffs' claims as unripe.

### IV.    Plaintiffs' Claims Fail Because They Do Not Allege a Final Agency Action.

Plaintiffs fail to state a claim under the APA because they do not and cannot allege a final agency action.  This fatal flaw defeats all of Plaintiffs' claims.  Recognizing that there is no private right of action under the Refuge Act and NEPA, Plaintiffs assert those claims (as they must) under the APA.  Compl. ¶¶ 148–182; *see also Defs. of Wildlife*, 651 F.3d at 116 (asserting Refuge Act violations under the APA); *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (recognizing no private right of action under NEPA and that "major federal action" under NEPA mirrors the "final agency action" required by the APA).  Plaintiffs' ESA claim, Compl. ¶¶ 183–189, arises under the ESA citizen-suit provision, 16 U.S.C. § 1540(g), but such claim is still reviewed under the standard of review provided in the APA and is still bound by the APA's requirement for final agency action.  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) (noting, when reviewing a claim that an agency had

failed to comply with ESA Section 7(a)(2) that "[t]he federal courts ordinarily are empowered to review only an agency's final action, *see* 5 U.S.C. § 704").  Because Plaintiffs' Refuge Act, NEPA, and ESA claims are reviewable only under the APA standards, and Plaintiffs have failed to state a critical element of an APA claim, all of Plaintiffs' claims fail and the Complaint must be dismissed in its entirety.

### A.    Only Final Agency Actions Are Judicially Reviewable.

Under the APA, a court may only review "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  While the finality requirement is not jurisdictional, without a final agency action, plaintiffs cannot state a claim for relief under the APA.  *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018), *cert. denied* 139 S. Ct. 1544 (2019); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).  "[T]wo conditions must be satisfied for agency action to be 'final':  First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. at 177–78 (internal citations and quotations omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807 (2016).  "An order must satisfy both prongs of the *Bennett* test to be considered final."  *Sw. Airlines Co. v. U.S. Dep't of Transp*., 832 F.3d 270, 275 (D.C. Cir. 2016).  In determining whether a final agency action exists, no one-size-fits-all approach applies.  "[T]o ascertain the nature of an agency action, courts should ground the analysis in the idiosyncratic regime of

statues and regulations that govern it." *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627,

632 (D.C. Cir. 2019).

### B.      The 2018 Memo Is Not a Final Agency Action.

The 2018 Memo does not satisfy either of the two conditions set forth in *Bennet v. Spear*.

The 2018 Memo is neither the consummation of the agency's decisionmaking process, nor does

the memo determine any legal obligations, rights, or consequences.

### 1.      *The 2018 Memo Does Not Consummate the Service's Decisionmaking Process.*

The 2018 Memo fails to meet the first prong of the *Bennett v. Spear* test because the

memo does not mark the consummation of the Service's decisionmaking process.  The plain

language of the 2018 Memo contemplates additional decisionmaking, and the Service's

governing statutes and regulations demonstrate that the 2018 Memo is not the culmination of the

Service's consideration of the issue.

On its face, the 2018 Memo is replete with anticipatory language, and is tentative and

interlocutory in nature.  The memo expressly contemplates additional decisionmaking, including

future NEPA compliance, and further consideration of the issue.  By withdrawing the 2014

Memo, the 2018 Memo does not automatically approve the use of GMOs or neonicotinoids on

any of the refuges; it merely allows the *consideration* of these practices.  2018 Memo (listing

refuges that "may *consider* the options of GMO seed use." (emphasis added)).  The prospect of

future consideration necessarily means that the Service's decisionmaking has not ended.  At this

point, the Service may now "determine the appropriateness of the use of [GMO] crops on a case-

by-case basis in compliance with all relevant and controlling legal authorities (including NEPA)

and Service policies."  *Id*.  The 2018 Memo makes no actual determinations as to the

appropriateness of using GMOs or neonicotinoids on any of the refuges.

With over 500 refuges, the Service may issue not one but multiple final agency actions (and possibly multiple final agency actions per refuge).  Each separate instance where the Service may consider the use of GMOs or neonicotinoids represents a separate juncture, presenting an opportunity for additional decisionmaking that, to be clear, had not taken place at the time that the Complaint was filed and may never take place.  The Service may determine that, for some or all of the refuges, GMOs and neonicotinoids should not be applied.  In the thirteen months since the 2018 Memo was issued, the Service has not approved any new agricultural uses of either GMOs or neonicotinoids on the refuges.  Martinez Decl. ¶¶ 6–7.  And, the 2018 Memo acknowledges that "[i]n some cases, the phasing out of those practices was appropriate and expedient."  2018 Memo.  Or, the Service may approve the use of GMOs or neonicotinoids for a limited number of refuges, after first complying with its obligations under NEPA, the ESA, and the Refuge Act.  In other words, the 2018 Memo's language demonstrates that the Service has not consummated its decisionmaking as to the use of GMOs or neonicotinoids.  The nature and form of any future uses must depend upon additional events.

Second, according to the Service's decisionmaking processes set out in its governing statutes and regulations, the 2018 Memo does not represent the culmination of that agency's consideration of the issue.  *See Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (as considered by FDA's own Manual, FDA's warning letters that precede enforcement action "do not mark the consummation of FDA's decisionmaking"); *Soundboard*, 888 F.3d at 1267.  At this time, under the Refuge Act and pursuant to its Manual, the Service could take any number of actions in the future that would necessitate additional decisionmaking by the Service.  For example, before GMOs or neonicotinoid requests are approved for agricultural use on a refuge, the Service must consider the request, comply with all applicable

laws, such as NEPA and the ESA, and then prepare a decision, such as the approval of a comprehensive conservation plan, a compatibility determination, or a cooperative agricultural agreement.  *See* 16 U.S.C. § 668dd(e) (comprehensive conservation plan) and (d)(3)(A)(i) (compatibility determinations); *see also* 602 FW 1–4 (describing refuge management planning documents).  No final agency action occurs until the Service makes such a determination. Indeed, numerous past lawsuits that challenged the Service's approval of GMOs or neonicotinoids challenged final agency actions such as compatibility determinations or agreement approvals.  None of the previous lawsuits challenged a vague and interlocutory general statement of policy like the 2018 Memo.  *See supra* Factual Background, Part III.

In other words, the 2018 Memo does not constitute a final agency action because it permits only consideration of "subsequent discretionary actions requir[ing] separate and independent decisionmaking that . . . are divorced from the prior [] decision." *Lujan*, 497 U.S. at 893 n.3; *see also Fund for Animals v. Williams*, 391 F. Supp. 2d 132, 138 (D.D.C. 2005) (no final agency action where the Service's announcement of goals had no direct and immediate effect on those regulated).  The 2018 Memo was not the consummation of the Service's decisionmaking process.  Both the language of the memo and the Service's regulations and internal policies prevent the approval and application of GMOs or neonicotinoids without future decisionmaking that is independent of the 2018 Memo.

### 2.       The 2018 Memo Has No Legal Consequences.

The 2018 Memo fails to satisfy the second prong of the *Bennett v. Spear* test because no legal consequences flow from the 2018 Memo.  Whether an agency action has "direct and appreciable consequences" is a "pragmatic inquiry" that counsels courts to analyze "the concrete

consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *Cal. Communities,* 934 F.3d at 637.

On its face, the 2018 Memo permits refuges only to *consider* requested uses of GMOs or neonicotinoids, subject to compliance with applicable laws. The memo creates no binding rights or obligations. It does not mandate the use of neonicotinoids or GMOs. It imposes no legal penalties. It changes no statute or regulation. The 2018 Memo does not rescind or alter the BIDEH or IPM Policy in the Manual, which themselves are guidelines and not legally binding. *McGrail & Rowley, Inc. v. Babbitt*, 986 F. Supp. 1386, 1393 (S.D. Fla. 1997), *aff'd* 226 F.3d 646 (11th Cir. 2000) (plaintiffs did not show Service's Manual carried independent force and effect of law); *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996) (Forest Service manual did not carry force of law). In short, the 2018 Memo, which does not change any statute or regulation, has no legal ramifications.

In analogous circumstances, courts have found no judicially-reviewable final agency action. In *California Communities*, the court considered whether a memo that changed the Environmental Protection Agency's (EPA) interpretation of one section of the Clean Air Act satisfied the second prong in *Bennett v. Spear*. *See* 934 F.3d at 637. The memo at issue in that case stated that "the statute's plain-language 'compels the conclusion' that a major source becomes an area source at such time when it takes an enforceable limit on its potential to emit to below the major source threshold." *Id.* The court affirmed dismissal on finality principles because the memo had no direct or appreciable consequences and was, in essence, "all bark and no bite." *Id.* The 2018 Memo likewise possesses no "bite," or legal ramifications. The 2018 Memo's connection to a final agency action is even more attenuated than the *California*

*Communities* memo because the 2018 Memo merely returned to the earlier status quo ex ante without adopting a new, definitive interpretation.

Recently, in *State of California v. Environmental Protection Agency*, 940 F.3d 1342, 1350 (D.C. Cir. 2019), the court affirmed dismissal on finality grounds where the EPA's revised determination of greenhouse gas emissions standards contained "may" language.  The court held that such language did not erase past findings but only announced the agency's intent to possibly change existing regulations.  The 2018 Memo contains similar "may" language, and likewise has no legal effect.  The Memo states that the Service "may" consider the use of GMOs or neonicotinoids on a "case-by-case" basis and does not call for their use where those practices have been phased out.  2018 Memo.  Rather, the 2018 Memo merely announces the Service's intent to evaluate possible changes in the future.

Plaintiffs allege that "it is now the official position of the Defendants" that neonicotinoids and GMOs "can be utilized" and that the 2018 Memo "is binding" and a "final agency action from which important legal, policy, and practical consequences flow."  Compl. ¶¶ 8–9; *see also* Compl. ¶¶ 144, 146, 159–160.  No factual allegations support this legal conclusion.  To the contrary, Plaintiffs' conclusory statements directly conflict with the plain language of the 2018 Memo and need not, and should not, be accepted by the Court.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotations omitted)); *Kaempe*, 367 F.3d at 963 (the court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice.").  Nothing in the 2018 Memo affirmatively approves the use of neonicotinoids or GMOs on any refuge.  2018 Memo.  The plain language of the memo merely permits the Service to *consider* requests for use, subject to compliance with all relevant

authorities.  Therefore, the 2018 Memo is not a final agency action from which legal consequences flow.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss should be granted, Plaintiffs' Complaint for Declaratory and Injunctive Relief should be dismissed, and judgment should be entered in favor of Defendants.


DATED this 6th day of December, 2019.

Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment & Natural Resources Division


*/s/ Sarah Izfar*

SARAH IZFAR (D.C. Bar No. 1017796)
DEVON FLANAGAN (D.C. Bar No. 1022195)
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife & Marine Resources Section &
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0490
Sarah.izfar@usdoj.gov

*Counsel for Defendants*

Of Counsel:

LINUS CHEN
LARRY MELLINGER
Office of the Solicitor, Parks & Wildlife
Department of the Interior
1849 C Street NW
Washington, D.C. 20240