## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **CENTER FOR BIOLOGICAL** ) | |
| **DIVERSITY,** *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Case No. 19-cv-02898 (APM)** |
| ) | |
| **DAVID BERNHARDT,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

Plaintiffs Center for Biological Diversity and Center for Food Safety are two environmental nonprofit organizations.   On behalf of themselves and their members, they bring this action to challenge a memorandum issued in 2018 by the former Acting Director of the United States Fish and Wildlife Service, which withdraws a memorandum issued four years earlier stating the agency's intent to phase out most uses of neonicotinoid pesticides and genetically modified crops within the National Wildlife Refuge System.   Plaintiffs claim that the issuance of the 2018 Memorandum violates multiple statutes, including (1) the Administrative Procedure Act, (2) the National Wildlife Refuge System Administration Act as amended by the National Wildlife Refuge System Improvement Act, (3) the National Environmental Policy Act, and (4) the Endangered Species Act.   Defendants move to dismiss all claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiffs lack standing and that their claims are not ripe for adjudication.   Defendants also move to dismiss for failure to state a claim under Rule 12(b)(6), because the 2018 Memorandum is not a final agency action.

Because the court finds that Plaintiffs lack standing, it grants Defendants' Rule 12(b)(1) motion on that ground.   As a result, the court does not address Defendants' arguments regarding ripeness or finality.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   The 2014 Memorandum

On July 17, 2014, James W. Kurth, Chief of the National Wildlife Refuge System ("System"), issued an internal memorandum to the Regional Refuge Chiefs for Regions 1–8 concerning the use of agricultural practices for wildlife management within national wildlife refuges.   Compl., ECF. No. 1 [hereinafter Compl.], Ex. A, ECF No. 1-2 [hereinafter 2014 Memo]. Kurth made two policy announcements relevant to this case.   First, he declared that the United States Fish and Wildlife Service ("Service") would "no longer use neonicotinoid pesticides in agricultural practices used in the System."   *Id*.   Neonicotinoid pesticides ("neonics") are "neurotoxic pesticides that are known to cause adverse impacts on a wide range of taxonomic groups, especially bird, aquatic insect, and pollinator species."   Compl. ¶ 97.   Invertebrates exposed to neonics may suffer from "nervous system overstimulation and eventually paralysis and death."   *Id*. ¶ 98.   Vertebrates "can experience similar toxicity issues," leading to "decreases in fat stores and body mass, reproductive effects, and failure to orient correctly during migration." *Id*.   The 2014 Memorandum reflected the Leadership Team's conclusion that "prophylactic use" of neonics could distribute the pesticides systemically within plants and could "potentially affect a broad spectrum of non-target species" in a manner "not consistent with Service policy."   2014 Memo at 1.   Stopping short of instituting a blanket ban, the Service acknowledged that there could be "appropriate and specialized uses of [neonics]" and stated that decisions on those uses would

be "subject to review through all applicable laws, regulations, and policies, including, but not limited to, the National Environmental Policy Act ['NEPA']." *Id.*

Second, the 2014 Memorandum declared that the Service would "phase out the use of genetically modified crops ['GMCs'] to feed wildlife." *Id.* GMCs are genetically engineered to resist otherwise lethal amounts of target pesticides, thus permitting "increased pesticide spraying at increased intervals during farming season." Compl. ¶¶ 109, 111. Because the System demonstrated its ability "to successfully accomplish refuge purposes . . . without using genetically modified crops," the Service determined that "it is no longer possible to say that their use is essential to meet wildlife management objectives." 2014 Memo at 2. As with neonic use, the Service did not place a ban on GMCs, but stated that it would "consider whether the[ir] temporary use . . . in habitat restoration is essential on a case-by-case basis." *Id*.

### 2. The 2018 Memorandum

These policies would be modified four years later. On August 2, 2018, Gregory J. Sheehan, the Acting Director and Principal Deputy Director of the Service, issued a two-page internal memorandum to the Service Directorate "withdrawing the [2014 Memorandum] in full." Compl., Ex. B, ECF No. 1-3 [hereinafter 2018 Memo], at 2. Addressing the issue of GMC use within refuges, Sheehan announced that, because there may be situations "where use of GMO crop seeds is essential to best fulfill the purposes of the refuge and the needs of birds and other wildlife," the "blanket denial" of GMC use "does not provide on-the-ground latitude for refuge managers to work adaptively and make field level decisions about the best manner to fulfill the purposes of the refuge." *Id*. Sheehan stated that the Service would "determine the appropriateness of the use of [GMCs] on a case-by-case basis, in compliance with all relevant and controlling legal authorities (including NEPA) and Service policies." *Id*.

The 2018 Memorandum announced a similar change with respect to neonics.   No longer would there be a presumptive ban on their use.   Rather, because neonics "may, or may not, be needed to fulfill needed farming practices," "[c]onsideration" of their use would now also be subject to a "case-by-case" analysis in compliance with the appropriate authorities.   *Id*.

The 2018 Memorandum concluded by providing a non-exhaustive list of refuges that "may consider" GMC seed use but noted that such use could not resume in Region 5 until any NEPA review is complete and the use is compliant with the settlement agreement reached in *Delaware Audubon Society, Inc. v. Secretary of U.S. Department of Interior*, 612 F. Supp. 2d 442 (D. Del. 2009).   2018 Memo at 2.

**B.      Procedural History**

On September 26, 2019, Plaintiffs filed this suit against the Service and the United States Department of the Interior, as well as David Bernhardt and Margaret Everson in their official capacities (collectively, "Defendants").   Plaintiff Center for Biological Diversity ("CBD") is "dedicated to the protection of native species and their habitats through science, policy, education, and environmental law."   Compl. ¶ 14.   Plaintiff Center for Food Safety ("CFS") strives "to protect food, farmers, and the environment from the adverse impacts of industrial agriculture" by "generat[ing] public involvement, education, and engagement with government officials" on relevant issues.   *Id*. ¶¶ 18–19. On behalf of themselves and their members, Plaintiffs seek declaratory and injunctive relief.   *Id.* ¶ 10.

Plaintiffs assert three claims.   First, they contend that the 2018 Memorandum runs afoul of the National Wildlife Refuge System Administration Act and is otherwise arbitrary and capricious in violation of Section 706(2)(A) of the Administrative Procedure Act ("APA").   Compl. ¶¶ 148–170.   Next, they claim that Defendants violated the procedural requirements of

NEPA and Sections 706(2)(A) and 706(1) of the APA.   Compl. ¶¶ 171–82.   Finally, Plaintiffs allege that Defendants—prior to issuing the 2018 Memorandum—failed to comply with the procedural and substantive requirements of the Endangered Species Act ("ESA"), particularly the requirement that the Service consult internally to determine whether the 2018 Memorandum would "jeopardize the continued existence" of any endangered or threatened species, *see* 16 U.S.C. § 1536(a)(2).   Compl. ¶¶ 183–89.

On December 6, 2019, Defendants filed their Motion to Dismiss, arguing that the court lacks subject matter jurisdiction and that Plaintiffs fail to state a claim.   Defs.' Mot. to Dismiss Pls.' Compl., ECF No. 15 [hereinafter Defs.' Mot.].

## III.   LEGAL STANDARD

Because the court resolves this matter on the question of standing, it sets forth only that legal standard here.   A federal court must presume that it "lack[s] jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).   The party asserting jurisdiction has the burden of demonstrating the contrary, including establishing the elements of standing. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).   Standing must be demonstrated "for each claim," *DaimlerChrysler*, 547 U.S. at 352 (citation and internal quotation marks omitted), "with the manner and degree of evidence required at the successive stages of litigation," *Lujan*, 504 U.S. at 561.

On a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the court must accept all well-pleaded factual allegations in the complaint as true. *See Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005).   But the court need not assume the truth of legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or "accept inferences

that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007).   "Threadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice."   *Iqbal*, 556 U.S. at 678.   If a complaint does not contain sufficient factual matter "to state a claim [of standing] that is plausible on its face," it must be dismissed.   *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   The court may consider "such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case."   *Scolaro v. D.C. Bd. Of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## IV.   DISCUSSION

To maintain an action in federal court, a plaintiff must satisfy the traditional elements of Article III standing: (1) "an injury-in-fact," (2) "that is fairly traceable to the challenged conduct of the defendant," and (3) "that is likely to be redressed by a favorable judicial decision."   *Spokeo, Inc. v. Robins*, 578 U.S. ___, ___, 136 S. Ct. 1540, 1547 (2016).   An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."   *Lujan*, 504 U.S. at 560 (cleaned up).   To maintain jurisdiction, the court need only find that one plaintiff has standing.   *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

Here, Plaintiffs offer three primary theories of standing.   First, they argue that they have organizational standing to bring suit on their own behalf.   Second, they contend that they have associational standing to bring suit on behalf of their members.   Third, they assert procedural standing based on violations of NEPA and the ESA.   The court addresses each theory in turn.

### A.    Organizational Standing

An organization may assert standing on its own behalf, but to do so it must, "like an individual plaintiff," "show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and is likely to be redressed by a favorable court decision." *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (internal quotation marks omitted). In evaluating whether the organization has suffered a concrete and demonstrable injury, a court must ask "first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (alteration adopted).

To establish an injury to its interest, "an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services." *Id.* (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)).   An organization's ability to provide services is perceptibly impaired "when the defendant's conduct causes an 'inhibition of [the organization's] daily operations.'"  *Id.* (quoting *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)).   Use of an organization's resources "for litigation, investigation in anticipation of litigation, or advocacy" does not create a cognizable Article III injury.  *Id.* at 919.  The same is true when the organization "expends resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended."  *Id.* at 920 (cleaned up).   In this case, neither Plaintiff has alleged a sufficient injury to its organizational interests.

At the outset, Plaintiffs claim that the 2018 Memorandum impaired their ability to protect species and habitats on national wildlife refuges because "practices that are known to be harmful to species"—ostensibly the use of GMCs and neonics—"can now be used across the Refuge

System." Pls.' Opp'n to Defs.' Mot. to Dismiss, ECF No. 18 [hereinafter Pls.' Opp'n], at 34. They further contend that the Service has developed "proposed guidance for implementing the use of [neonics] authorized by the [2018 Memorandum]." *Id.* But those arguments overstate the actual effect of the 2018 Memorandum. Although it withdraws the 2014 Memorandum's restrictions in full, and thereby effects a change in policy, the 2018 Memorandum does not authorize the use of neonics or GMCs throughout the System or within any particular refuge. By its own terms, the 2018 Memorandum contemplates only the "consideration" of such practices on a "case-by-case basis." 2018 Memo at 2. And before the Service can permit the use of either practice, the agency must "compl[y] with all relevant and controlling legal authorities (including NEPA) and Service policies." *Id.* Those additional requirements explain why, despite multiple requests, as of the date of Plaintiffs' Complaint, the Service "has not authorized the use of any genetically modified crops or neonicotinoid pesticides as a result of the 2018 memo." Defs.' Mot., Ex. 1, Martinez Decl., ECF 15-2, ¶¶ 6, 16. Events following the close of briefing underscore the antecedent nature of the 2018 Memorandum. The Service on March 30, 2020, issued a draft Programmatic Environmental Assessment and on June 4, 2020, issued a final Assessment for GMC use on refuges in the Southeastern United States. *See* Defs.' Second Notice of Recent Events, ECF No. 28 at 1–2. The final Assessment notes the Southeastern refuges "will use a tiered analysis to determine *whether* to permit the use of genetically engineered crops on a particular refuge," which will include various additional environmental assessments. *Id.* at 2 (emphasis added); *id.*, Ex. A, ECF No. 28-1, at 163. As the steps taken following the 2018 Memorandum and the additional evaluations still to come show, Plaintiffs cannot plausibly allege the perceptible impairment necessary to establish an injury to their interests stemming from the 2018 Memorandum.

Plaintiffs also argue that the 2018 Memorandum caused injury when it required them to reallocate significant staff time, expertise, and funds to counteract the harm to their missions. Pls.' Opp'n at 35.   In his declaration, Andrew Kimbrell, the Executive Director of CFS, states that the organization "sent out at least four different wildlife refuge alerts and appeals to its members specifically notifying them" of the Service's reversal.   Pls.' Opp'n, Kimbrell Decl., ECF No. 18-8 [hereinafter Kimbrell Decl.], ¶ 20.   To produce those alerts, "staff time was diverted from other pressing education and outreach tasks related to CFS's pesticide and pollinator programs, such as the harm of pesticide and [genetically engineered] crops in other agricultural settings."   *Id.* ¶ 21. Kieran Suckling, the Executive Director of CBD, recounts a similar impact.   He states: "[S]taff time was diverted from other important conservation issues, such as informing the public about water pollution from industrial animal feeding operations, the environmental impacts of invasive species, or the various impacts of pesticide exposure to species, the environment, and public health."   Pls.' Opp'n, Suckling Decl., ECF No. 18-9 [hereinafter Suckling Decl.], ¶¶ 26–27.

Those injuries, however, are analogous to the injuries considered and rejected by the D.C. Circuit in *Food & Water Watch*.   Plaintiff in that case was a consumer group challenging USDA poultry regulations that shifted responsibility for certain inspection tasks from federal inspectors to industry personnel.   808 F.3d at 910–11.   In defense of its organizational standing, the group stated that, due to the new regulations, it would have to increase resources spent on educating the general public that a USDA inspection legend did not mean that the poultry product was safe and persuading its members to avoid poultry products not inspected by government personnel.   *Id.* at 920.   The Circuit held that the group had not shown that its organizational activities had been "perceptibly impaired."   *Id.* at 921.   Instead, the group had "alleged nothing more than abstract injury to its interests that [was] insufficient to support standing."   *Id.*

9

So, too, here.   The activities identified in the Kimbrell and Suckling declarations more closely resemble component parts of larger advocacy and lobbying efforts.   Kimbrell admits that CFS's alerts to its members are intended to "rally[] them to take actions to counter the 2018 [Memorandum]."   Kimbrell Decl. ¶ 20.   And Suckling states that CBD's alerts to its members and the general public are meant to "encourage[] them to sign onto a petition to [the Service] requesting that [neonic and GMC use] be discontinued in national wildlife refuges."   Suckling Decl. ¶ 25.   These types of efforts have long been considered insufficient to establish a cognizable organizational injury.   *See Turlock*, 786 F.3d at 24; *Ctr. For Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) ("This Court has not found standing when the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities.").[1]

Plaintiffs' attempt to distinguish *Food & Water Watch* is unconvincing.   They assert that, in that case, the plaintiff failed to establish organizational standing because "the injuries identified were in the form of *future* expenditure[s] of resources and time . . . not *present* expenditures." Pls.' Opp'n at 38.   By contrast, Plaintiffs here "allege *significant past and ongoing* diversions of resources as a result of the 2018 [Memorandum]."   *Id.*   But the Circuit's reasoning in *Food & Water Watch* ascribes no weight to that temporal distinction.   In arriving at its holding, the Circuit found it instructive to compare the facts before it to those in *PETA v. USDA.*   808 F.3d at 920–21.   There, PETA claimed that the USDA had violated the law by not applying the Animal Welfare Act to birds, and thus, the agency was not generating the inspection reports that PETA used to educate its members.   797 F.3d at 1094.   And because the USDA failed to collect

---

[1] Plaintiffs also contend that the 2018 Memorandum's lack of environmental impact analyses has forced CFS to spend more resources on FOIA requests in order to "specifically monitor and assess" neonic and GMC use on national wildlife refuges.   Kimbrell Decl. ¶ 22; *see also* Pls.' Opp'n at 34–35.   But because those extra requests appear to be predicates for future advocacy, lobbying, litigation, or member education efforts, *see* Kimbrell Decl. ¶ 22 (suggesting the FOIA requests are part of the organization's "mission as a government watchdog"), they do not constitute cognizable injuries.

information about bird mistreatment, PETA also claimed that it lacked the requisite data to bring statutory violations to the agency's attention.  *Id.*  The Circuit held that PETA's two alleged harms—the denial of educational information and the inability to seek redress for a violation of the law—sufficed to establish an injury.  *Id.* at 1095.  The plaintiff in *Food & Water Watch*, on the other hand, failed to allege either type of injury.  808 F.3d at 921.  Ultimately, that failure— not any alleged distinction between past or present expenditures—explains the Circuit's conclusion on standing in *Food & Water Watch*.

Plaintiffs attempt to cover their bases by suggesting that this case is comparable to *PETA*. Pls.' Opp'n at 35–37.  Not so, and for multiple reasons.  For one, Plaintiffs do not allege injury based on the inability to bring statutory violations to the Service's attention.  More importantly, although Plaintiffs do allege informational injury stemming from Defendants' noncompliance with the ESA and NEPA, *see* Pls.' Opp'n at 42, those allegations are not enough.  "A plaintiff suffers sufficiently concrete and particularized informational injury where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."  *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).  Defendants concede that Plaintiffs' NEPA-related injury meets the first prong, but they insist that the ESA-related injury does not, because the ESA contains no public disclosure requirement.  Defendants are correct.  *See* 16 U.S.C. § 1536(b)(3)(A) (specifying that the consultation opinion "shall [be provided] to the Federal agency and the applicant, if any"); *cf. Fund For Animals v. Hall*, 448 F. Supp. 2d 127, 136 (D.D.C. 2006) ("[T]he ESA's Section 7 consultation process fails to provide for public comment in the same way that NEPA does.").  Thus, Plaintiffs' ESA-related injury is not cognizable.

11

Likewise, Plaintiffs' claimed informational injury under NEPA falls short.   In *Foundation on Economic Trends v. Lyng*, 943 F.2d 79 (D.C. Cir. 1991), the Circuit stated that it had "never sustained an organization's standing in a NEPA case solely on the basis of . . . damage to the organization's interest in disseminating the environmental data an impact statement could be expected to contain." *Id.* at 84.   Doing so, the Circuit continued, "would potentially eliminate any standing requirement in NEPA cases" because "any member of the public—anywhere—would seem to be entitled to receive [information contemplated by the statute]." *Id.* at 84–85. "[W]ithout more," a standalone assertion of an improper denial of information pursuant to NEPA would convert "a mere interest in a problem" into a cognizable injury—a result at odds with established jurisprudence.   *Id.* (cleaned up) (citing *Sierra Club v. Morton*, 405 U.S. 727 (1972)). Here, Plaintiffs do not allege a deprivation of information under NEPA any greater than that which is suffered by the general public.   Without a differentiating harm, Plaintiffs' NEPA-related informational injury amounts to no more than "a mere interest" in the disuse of pesticides and other practices on national wildlife refuges, which does not suffice for Article III standing.

The court therefore finds that neither Plaintiff has alleged an injury to its interests sufficient to satisfy organizational standing requirements.

## B.     Associational Standing

Plaintiffs separately assert associational standing on behalf of their members.   Pls.' Opp'n at 39–41.   To establish associational standing, Plaintiffs must demonstrate (1) "that at least one member would have standing under Article III to sue in his or her own right"; (2) "that the interests it seeks to protect are germane to its purposes"; and (3) "that neither the claim asserted nor the relief requested requires that an individual member participate in the lawsuit." *Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007); *see Hunt v. Wash. Apple Advert. Comm'n*,

432 U.S. 333, 343 (1977).   There is no dispute as to the second and third requirements, so the court focuses its analysis on the first—whether any of Plaintiffs' individual members have standing.

Plaintiffs claim that the 2018 Memorandum impairs their members' use of national wildlife refuges for "recreational, scientific, and aesthetic purposes," including experiencing threatened and endangered species.   Compl. ¶¶ 24–25.   "Plaintiffs' members who use and recreate on and around refuges are also at a greater risk of suffering from adverse health effects from pesticide exposure because of the 2018 [Memorandum]."   *Id.* ¶ 26.   And the "cultivation of [genetically engineered] crops," Plaintiffs assert, "compromises members' enjoyment of the refuges, because the crops pose risks to wildlife" and injure the interests of those who seek to maintain biodiversity. *Id.*

To demonstrate their injuries, Plaintiffs submit declarations from three members of CBD. Tierra Curry has been a member since 2004 and has been employed as a senior scientist with CBD since 2007.   Pls.' Opp'n, Curry Decl., ECF No. 18-5 [hereinafter Curry Decl.], ¶¶ 3–4.   An "avid naturalist and recreationist," Curry "tends to plan [her] personal activities to coincide with areas where [she] know[s] [she] may be able to view imperiled species in the wild."   *Id*. ¶ 8.   In the past year, Curry has visited the Reelfoot, Clarks River, and Tennessee National Wildlife Refuges in Kentucky and Tennessee.   *Id*. ¶ 10.   She lists the specific wildlife she came across during those visits—including monarch butterflies, bats, and freshwater mussels—and explains her concerns that the use of neonics and GMCs will render habitats unsuitable for those species and "decrease [her] ability to observe, recreate among, and enjoy [those] species when [she] visit[s]" the refuges. *Id*. ¶¶ 11–20.   Her fears are "heightened" by her knowledge that all three refuges have expressed

interest in utilizing those very practices following the issuance of the 2018 Memo.   *Id*. ¶¶ 11, 15, 20.

A.J. Jenkins has been visiting and recreating on the Wheeler National Wildlife Refuge since a young age.   Pls.' Opp'n, Jenkins Decl., ECF No. 18-6 [hereinafter Jenkins Decl.], ¶ 7.   He often spends his time "looking for, photographing, and learning about the various species of reptiles and amphibians" located on the refuge.   *Id*.   As a sportsman, Jenkins gets "great satisfaction knowing that there are rare and interesting species in the areas where [he is] hunting," and states that he would be harmed if those populations decline "as a result of [the Service's] decision to allow neonicotinoid pesticides and genetically engineered crops . . . to be used on national wildlife refuges."   *Id*. ¶ 11.   Like Curry, he is "especially concerned about the adverse effects of [the 2018 Memorandum] because it is [his] understanding that [the Service] intends to use either or both of those practices."   *Id*. ¶ 19.   His concern is exacerbated by the Service's "refusal to engage in consultation under the [ESA] or environmental analysis under [NEPA]" prior to permitting the use of those practices.   *Id*. ¶ 19.

Kristy Kasserman currently resides in North Carolina and has been taking regular trips to the Alligator River and Pocosin Lakes National Wildlife Refuges, "usually visiting the refuges at least once in spring, once in fall, and almost always over the holidays in December."   Pls.' Opp'n, Kasserman Decl., ECF No. 18-7 [hereinafter Kasserman Decl.], ¶ 6.   As a birdwatcher, she estimates having encountered "approximately 35" native bird species during her last few visits, including red-tailed hawks, great crested flycatchers, yellow-rumped warblers, and northern flickers.   *Id*. ¶ 7.   Kasserman also enjoys using the refuges "for the purposes of hiking, photography, recreating, and generally observing wildlife."   *Id*. ¶ 11.   She recounts how she once observed a group of black bears "in and around corn crops" growing on the Pocosin Lakes Refuge,

and that her "immediate concern" was whether those bears were "being exposed, through ingestion or direct application, to any pesticides that might have been used to grow that corn."  *Id*. ¶ 11. "[T]o think that they might, either then or now as a result of the [Service's] decision to allow [GMCs and neonics], be exposed to harmful agricultural pesticides . . . breaks my heart."  *Id*. Kasserman also expresses concerns that pesticide use will endanger the refuges' biodiversity as well as her own health due to exposure during her visits.  *Id*. ¶¶ 12, 17.   Like Jenkins, she claims further injury based on the Service's decision to issue the 2018 Memo "behind closed doors and without compliance with federal law."  *Id*. ¶ 20.

While the court understands and appreciates the declarants' commitment to wildlife preservation and biodiversity, for purposes of Article III standing, their concerns do not amount to an "actual or imminent" injury.  *Lujan*, 504 U.S. at 560.   An actual or imminent injury is "certainly impending and immediate—not remote, speculative, conjectural, or hypothetical." *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1293 (D.C. Cir. 2007). *Gulf Restoration Network, Inc. v. National Marine Fisheries Service*, 730 F. Supp. 2d 157 (D.D.C. 2010), illustrates the point.   There, plaintiff organizations claimed that a Fishery Management Plan for regulating offshore marine aquaculture in the Gulf of Mexico violated several federal laws, including NEPA.  *Id*. at 159.   In a series of affidavits, members of plaintiffs' organizations stated that the Plan would, among other things, hurt their interests "in the well-being of the Gulf," "damage[] the ecosystem," and "harm[] wild fish populations."  *Id*. at 166.   The court nevertheless held that plaintiffs did not have standing to challenge the Plan because their asserted injuries were "dependent upon a chain of events that might occur," including approval by the relevant government bodies "on a case-by-case basis."  *Id*.   As the court put it: "The [Fishery

Management Plans] alone do not have any regulatory effect because implementing regulations must be approved in order to effectuate them." *Id.*

Plaintiffs' members' purported injuries in this case suffer from essentially the same deficiency. The 2018 Memorandum does not actually authorize the use of either neonics or GMCs, and thus, the individual members can only present their injuries in speculative terms. *See, e.g.*, Curry Decl. ¶ 20 (noting that the refuges she plans to visit again have only "expressed interest" in neonics/GMCs); Jenkins Decl. ¶¶ 19 (same), 17 (expressing concern "*if* th[e] forest ecosystem[] is further impaired or otherwise compromised as a result of agricultural practices on the Wheeler National Wildlife Refuge that *may* result from the [2018 Memorandum]" (emphasis added)); Kasserman Decl. ¶ 18 (speculating on species and biodiversity loss that "*may* occur" due to the 2018 Memorandum and asserting injury "*if* those losses occur" (emphasis added)). Just as in *Gulf Restoration Network*, a series of subsequent events—many of which are still purely hypothetical—must occur before either neonics or GMCs are formally authorized for use in any of the refuges referenced in the members' declarations. *See* 2018 Memo at 2 (requiring conformity with NEPA and the Service's internal policies before authorizing use); *see also* Defs.' Mot., Defs.' Mem. in Supp. of Mot. to Dismiss, ECF No. 15-1, at 16 (providing one example of the multi-step process before authorization). And as a general matter, the case-by-case approach contemplated by the 2018 Memorandum gives refuge managers "on-the-ground latitude" to reject use requests based on localized judgments about the purpose of a particular refuge. *See* 2018 Memo at 2. Because the 2018 Memorandum does not actually authorize the use of the practices challenged by Plaintiffs, either generally or in any specific refuge, and because any such authorization would require further agency actions, Plaintiffs' members' claimed injuries are not sufficiently "actual or imminent" to establish Article III standing.

Plaintiffs respond by arguing that they need only demonstrate a "substantial risk" that their members' injuries will occur.  Pls.' Opp'n at 40 (citing *Nat. Res. Def. Council v. EPA*, 464 F.3d 1, 6–7 (D.C. Cir. 2006)).  To be sure, the D.C. Circuit "generally require[s] that [a plaintiff] demonstrate a 'substantial probability,'" not certainty, "that they will be injured."  *Nat. Res. Def. Council*, 464 F.3d at 6.  But Plaintiffs do not meet even this lesser threshold.  Once again, the 2018 Memorandum did not greenlight the use of neonics or GMCs; rather, the Memorandum lifted the presumptive blanket ban on their use in favor of a "case-by-case" approach, which still will subject any proposed use to regulatory processes and approvals.  The mere prospect that the Service might someday authorize such use within a yet unknown refuge does not plausibly give rise to the substantial probability of harm required to establish standing.

The case law Plaintiffs cite only reinforces this conclusion.  *See* Pls.' Opp'n at 40. *National Resources Defense Council v. EPA* is distinguishable from the present case because it involved a dispute over a final rule that "*authorized* new production and consumption [of methyl bromide] up to the limit established" by the relevant authorities.   464 F.3d at 5 (emphasis added). Similarly, in *Ouachita Riverkeeper, Inc. v. Bostick*, the district court held that the United States Army Corps of Engineers did not err in finding that construction of a wastewater pipeline "was authorized" under two discharge permits issued by the Corps pursuant to the Clean Water Act. 938 F. Supp. 2d 32, 34 (D.D.C. 2013).  In a post-briefing notice to the court, Plaintiffs draw attention to the Circuit's recent decision in *National Resource Defense Council v. Wheeler*, but there, too, the agency rule at issue "[gave] regulated parties the legal right to replace ozone-depleting substances with HFCs."   955 F.3d 68, 80 (D.C. Cir. 2020).   Here, by contrast, the 2018 Memorandum does not authorize the use of any neonics or GMCs.   Plaintiffs also rely on *Attias v. Carefirst, Inc.*, but the risk posed to plaintiffs in that case was significantly greater than the risk

of injury here.   There, the plaintiffs alleged theft of Social Security or credit card numbers in a data breach.   865 F.3d 620, 627 (D.C. Cir. 2017).   The court held that plaintiffs had standing because it inferred that the third party that stole the plaintiffs' data had "both the intent and the ability to use that data for ill."   *Id.* at 628.   That inference was reasonable because, in the words of the court: "Why else would hackers break into . . . a database and steal consumers' private information?"   *Id.* (quoting *Remijas v. Neiman Marcus Grp.*, 794 F.3d 688, 693 (7th Cir. 2015)). Despite Plaintiffs' protestations, no such inference is reasonable here.   Given the significant uncertainty surrounding whether the Service will eventually authorize neonic or GMC use in *any* refuge, let alone one visited by one of Plaintiffs' declarants, the court may not assume the imminence of Plaintiffs' members' injuries.   *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–14 (2013) (rejecting "a speculative chain of possibilities" as the basis for injury).

Because Plaintiffs fail to establish Article III injury for any of their members, the court holds that they cannot rely on associational standing to bring their claims.

### C.    Procedural Standing

Finally, Plaintiffs assert procedural injuries on behalf of themselves and their members because issuance of the 2018 Memorandum flouted the procedural requirements of NEPA and the ESA and precluded Plaintiffs from participating in mandatory environmental review processes. Pls.' Opp'n at 42.   But "omission of a procedural requirement does not, by itself, give a party standing to sue."   *Food & Water Watch*, 808 F.3d at 921 (quoting *Ctr. For Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009)) (internal quotation marks omitted). In other words, a "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

As discussed, Plaintiffs have not plausibly established any concrete interest that is affected by the 2018 Memorandum; therefore, the procedural violations they allege cannot establish a cognizable Article III injury-in-fact.  *See Food & Water Watch*, 808 F.3d at 921 ("Because Plaintiffs have failed to establish that they will likely suffer a substantive injury, their claimed procedural injury necessarily fails.") (cleaned up); *City of Orrville, Ohio v. FERC*, 147 F.3d 979, 986 (D.C. Cir. 1998) ("Since plaintiffs lack standing to challenge [the agency's] substantive actions, they indeed lack standing to challenge procedural defects in the process that produced those actions.") (cleaned up).

## V.    CONCLUSION

Thus, for the reasons stated, Defendants' Motion to Dismiss is granted.   A separate final order accompanies this Memorandum Opinion.


Dated:   September 24, 2020

Amit P. Mehta
United States District Court Judge

19